IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 15, 2018 Session

## STATE OF TENNESSEE v. JERRY WADE SHERRILL

**Appeal from the Circuit Court for Wayne County**
**No. 15691    Robert Jones, Judge**

_____

### No. M2017-00643-CCA-R3-CD

_____

The Defendant, Jerry Wade Sherrill, was convicted by a Wayne County Circuit Court jury of two counts of rape, Class B felonies, and two counts of incest, Class C felonies. *See* T.C.A. §§39-13-503 (2014) (rape), 39-15-302 (2014) (incest). The trial court sentenced the Defendant to five years for the incest convictions and to eight years for the rape convictions, with all sentences to be served concurrently. On appeal, the Defendant contends that (1) the evidence is insufficient to support his convictions, (2) the trial court erred in denying his claim pursuant to *Brady v. Maryland* based upon the State's failure to disclose alleged incentives offered to the codefendant, (3) the trial court erred in denying his motion to dismiss pursuant to *State v. Ferguson* based upon lost evidence, (4) the trial court erred in denying his motion to dismiss based upon alleged prosecutorial misconduct, and (5) he is entitled to a new trial due to cumulative errors in the conviction proceedings. The State raises an additional allegation of error based upon the trial court's reduction of the Defendant's rape sentences from ten to eight years. We affirm the incest judgments and the rape convictions, but we remand for entry of amended judgments for the rape convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part; Amended in Part; Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Lee E. Brooks, Columbia, Tennessee, for the appellant, Jerry Wade Sherrill.

Herbert H. Slatery III, Attorney General and Reporter; Alexander C. Vey, Assistant Attorney General; Brent A. Cooper, District Attorney General; Beverly White, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

The Defendant's convictions relate to two occasions on which his wife, Jennifer Sherrill, and their eighteen-year-old intellectually disabled son had sexual intercourse. The Defendant was convicted on a theory of criminal responsibility.

At the Defendant's trial, Mrs. Sherrill testified that she had pleaded guilty but had not yet been sentenced for her participation in the offenses. She said she had not received any sentencing offers from the State which depended upon her testimony against the Defendant. She said she and the Defendant had been married for twenty-one years. She said that she attempted to obtain a divorce but that the Defendant refused to consent to the divorce. She said her attorney "put it on hold because I got incarcerated." She said they had two sons, the victim, who was born April 19, 1996, and the victim's brother, who was born June 16, 1998. Mrs. Sherrill testified that she graduated from high school with a special education diploma. She said that her marriage to the Defendant had been happy initially but that the Defendant became jealous after the victim's birth because the Defendant "wasn't the main attraction." She said the relationship continued to deteriorate after the Defendant's mother became ill. She said the Defendant became verbally abusive, calling her a "bitch" and saying she was "nasty." She said the Defendant poured water on her and falsely accused her of sending inappropriate photographs to people. She said he had been "very mean" during the time they lived in a rental house.

Mrs. Sherrill testified that, on June 3, 2014, she had sexual intercourse with the victim. She said the Defendant and the victim had been watching a "dirty movie" in the living room. She said the Defendant had wanted the victim to watch the movie with the Defendant. She said she did not agree with this but had "tried to keep the 'mosity' down" because she was concerned the Defendant would "do something to" her. She said that the Defendant and the victim came into the bedroom, where she was, and that the Defendant said they were "going to make [the victim] turn into being a man." She said that she begged the Defendant not to do this and that the Defendant told her she was going to do it because she was the Defendant's wife. She said that she walked away but that the Defendant threatened to hit and kill her.

Mrs. Sherrill testified that she complied with the Defendant's demands. She said the victim undressed and lay on the bed and that the Defendant told her to get on top of the victim. She said the victim was aroused. She said she undressed and complied. She said the Defendant stood beside the bed. She said the Defendant instructed her that she "better make [the victim] feel good" and that the victim "better enjoy it." She said the Defendant whispered in her ear, asking if she enjoyed the sex and making comments about the victim being a larger size than the Defendant. She said the victim's penis was in her vagina and that she "was doing the movements." She said the Defendant instructed

-2-

the victim to fondle her breast "because that's what a woman likes." She said she went to the bathroom when she saw that the victim was about to ejaculate. She said she dressed, went outside, and cried because she was ashamed. She said that after "things had kind of calmed down," the Defendant and the victim went into the living room, and she cooked dinner.

Mrs. Sherrill testified that she had been confused and "didn't really enjoy" the June 3 encounter. She acknowledged that she told Investigator Tommy Goetz that she enjoyed part of it.

Mrs. Sherrill testified that, two days later, on June 5, 2014, she was preparing to take a bath when the Defendant entered the bathroom and wanted her to have sex with the victim again. She said that she refused. She said that as she sat on the side of the bathtub after her bath, the Defendant pushed her into the tub. She said that she hit her head as a result of being pushed and that the Defendant smiled and said, "[Y]ou're going to do it again." She said the Defendant stated he wanted to show the victim that "he is going to be a man," that the victim "can be a man," and that "this is the way that it is supposed to be for a man." She said that she, the Defendant, and the victim went into the bedroom and that she and the victim had intercourse with the victim on top of her. She said that the Defendant instructed the victim regarding "how to move and to make it feel good for a woman." She said the Defendant was on the bed with her and the victim during the sexual encounter. She said she looked at the wall because it was degrading. She said the victim ejaculated on her leg. She said that while she and the victim had sex, the Defendant was beside them filming their activities with a cell phone. She said that the Defendant told her he wanted to keep the recording and that "[h]e said he wanted to keep it so he could remember what a special time this was because he said that he liked to watch stuff like that."

Mrs. Sherrill said that after the victim left the room, the Defendant said it was "his turn," and that the Defendant asked if she had enjoyed the encounter. She said that she told the Defendant, "no, not really" but that she had done what he told her to do. She said she and the Defendant had sex, which she did not enjoy.

Mrs. Sherrill testified that the victim had "special needs," which she had known since the victim was in kindergarten. She said the victim "was mentally retarded"[1] and had "ADHD" and dyslexia. She said that she and the Defendant had lived together from the time of their marriage until she left the marital home about a week after this incident. She said the victim had graduated from high school and that he was "supposed to" have a

---

[1] Hereafter, we will refer to this diagnosis as intellectually disabled. *See Van Tran v. State*, 66 S.W.3d 790, 795 (Tenn. 2001) (noting "the nationally recognized fact that every person who is mentally retarded has significant and serious impairments to intelligence and everyday functioning").

diploma. She said she attended "IEP" meetings at the victim's school.[2] She said the purpose of the meetings was to advise her about how the victim was progressing in school and about "reading scores and . . . stuff like that." She said that the Defendant took her to the victim's school for the IEP meetings but that he did not go inside to attend them. She said that the victim began receiving a Social Security Disability check soon after the victim started school and that the Defendant knew the victim received a disability check.

Mrs. Sherrill testified that she had sex with the victim because she thought the Defendant would kill her if she did not. She said the Defendant stated he would kill her if she did not comply. She said the Defendant told her, "[T]hat's what a woman is supposed to do. She is supposed to obey her husband." She said she had not been able to stand up to the Defendant on June 3, 2014, because she was scared of him. She said the Defendant had beaten her son, although she did not specify whether she was referring to the victim or the victim's brother.

Mrs. Sherrill testified that she was interviewed once by Investigator Goetz[3] and that she learned from her attorney the interview had not been recorded. She later said she talked to Investigator Goetz twice, both times before her arrest. She said she went to talk to him because she "wanted all this to end." She said that she had testified consistently with what she told Investigator Goetz. She acknowledged that she made a comment in the interview about her surprise at the size of the victim's penis but denied she had said she became sexually aroused by the sight of the victim's penis. She recalled telling Investigator Goetz, "I might could [sic] have prevented it," but she said she was scared of the Defendant, whom she said had done things she was "not allowed to talk about now." She acknowledged that she had told the investigators that she had sex willingly with the victim and that she had enjoyed it, but she stated she said this because she had been "very nervous." She said she had gone to Investigator Goetz of her own volition because she wanted to end the abuse and wanted the Defendant to leave her children and her alone. When asked about a statement to Investigator Goetz that the first sexual encounter had been an "experiment," she said, "Yes, because we had agreed on it, that it was just going to be one time. Because he kept wanting me to do things that was [sic] not appropriate, and I'm not going to say what they are, sir." She said the Defendant had urged her "to do stuff like that before" and that she had refused repeatedly. She said the Defendant urged her to do it once and that she thought she would only have to do it once. She said, as well, that the Defendant had stated previously that he wanted her "to be turned into a whore" because he "wanted to make money off" her.

---

[2] Other evidence showed that IEP was an acronym for Individualized Education Program.
[3] Other evidence showed that Lawrence County Investigator Laws was present, as well.

-4-

Mrs. Sherrill testified that when she decided to leave the Defendant shortly after the incidents, she told the Wayne County authorities "who came and got" her that the Defendant had been abusive, had hit the left side of her face, and had pointed a gun at her. She said she had not mentioned the gun on direct examination because she and the prosecutor had decided they were not going to talk about it. She said she left the Defendant on the particular evening because he had said he was going to kill her and the children that night. She said she was taken to a hospital for x-rays.

Mrs. Sherrill described the Defendant's gun as a silver and black "JUDGE" handgun, which she said the Defendant had purchased at "Lawson's." She agreed that the report regarding the handgun was in 2014, when she left the Defendant, and she said that Investigator Goetz had not been there when this report was made. She said she told the officers who assisted her when she left the Defendant that the Defendant had been beating her, forcing her to have sex with her son, and "doing other things" to her and the children. She said that she told Investigator Goetz in 2015 about the gun and that she told him in 2015 that she had previously reported these matters to law enforcement.

Mrs. Sherrill testified that the Defendant had a gun during the second incident, which had occurred on June 5, 2014. She said he had not had a gun during the first incident, which had occurred on June 3, 2014, "because it was an experiment." She said that on June 5, the Defendant brought out the gun and said, "[I]f you don't do this for me, . . . I'm going to shoot you in the head and let the kids watch you bleed."

Mrs. Sherrill testified that she told Investigator Goetz that the Defendant had a cell phone when she had sex with the victim but that she had not known whether the Defendant had recorded the events. She said the Defendant had tried to hide the cell phone. She agreed that when Investigator Goetz asked if she would have noticed if the Defendant had been recording, she had responded, "[Y]es, I would have noticed it."

Mrs. Sherrill testified that she had been happy when she was interviewed by Investigators Goetz and Laws because she had been away from the Defendant for almost a year. She said she and the children were able, at that time, to do things such as have friends and attend events that the Defendant had not allowed her to attend. She said that because she was happy at the time of the interview, she had not mentioned that she had been afraid of the Defendant. She then said she had been nervous and afraid to mention the Defendant's threats to kill her in the interview because she and her children were trying to move on, and the Defendant would not let them. She said she had not mentioned the gun because she "thought it was already in the records."

Mrs. Sherrill denied that she had a boyfriend after she left the Defendant and moved with the children to Lawrence County. She said the person had been a friend. She denied having sex with her friend. After she was asked if she had told police

-5-

investigators that she had sex with her friend, she said she had sex with him, but she stated her children had not been present.

Mrs. Sherrill testified that the Defendant said things to her several times when they were in bed about his desire for her to have sex with the victim. She said the Defendant said he thought it would be "cool." She said the Defendant's insistence reached the point at which he told her he was going to kill them and burn the house if she did not comply.

Mrs. Sherrill acknowledged that at a prior court appearance, she apologized to the Defendant because she had been "mean." She said she had to "fight for" her children and do what was right for them. She said she told the Defendant that they should be cordial for their children's benefit. She said that she and the Defendant could be friends but that she wanted a divorce.

A portion of Mrs. Sherrill's recorded statement was played for the jury. The trial court instructed the jury that out-of-court statements were not to be considered as substantive evidence but could be considered in determining the truthfulness of in-court statements. The court advised the jury, "[T]he first part of [the statement] is missing and no one can explain what happened to it, some sort of computer defect, and this is all we've got. It's all either side has."

It is apparent that the recording begins mid-interview. In the recording, Mrs. Sherrill said that she, the Defendant, and an unidentified woman had a three-way sexual encounter until one of her sons entered the room. She said the unidentified woman told her that the woman was going to "get" Mrs. Sherrill's children. Mrs. Sherrill thought the Defendant and the woman were seeing each other "behind [her] back." She said that she, the Defendant, and the children watched pornography together once but that she "put a stop to it."

In the recorded statement, Mrs. Sherrill said that she had sex with the victim on two occasions and denied any additional encounters with him. She said she told the Defendant she did not want to have intercourse with the victim and agreed she refused when the Defendant wanted her to perform oral sex on the victim. She said the Defendant hit her when she refused to perform oral sex. She said she cried and begged the Defendant because she did not want to have intercourse with the victim. She said she agreed to do it. She said she had pretended to enjoy the sexual activity with the victim because the Defendant told her she "was going to enjoy it." She said the Defendant told her he would kill her if she did not do it.

In the recorded statement, Mrs. Sherrill said that she did not enjoy the first encounter but that she participated in the second one because the Defendant pushed her and that she thought he would have hit her if she had refused. She thought the Defendant

-6-

would have held her and the children against their wishes if she had not agreed. She later said she enjoyed the first encounter because she had thought about someone else during it. She said she was ashamed of what she had done.

Mrs. Sherrill said in the recorded statement that the Defendant had, at an unspecified time, taken the victim's brother into the bathroom to show him how to pleasure himself manually.

Mrs. Sherrill acknowledged in the recorded statement that she had a sexual encounter with a male friend, but she said the victim and the victim's brother did not watch her have sex with the man.

Mrs. Sherrill's arrest was documented in the recording. She was charged with two counts of incest, two counts of rape, and two counts of aggravated rape by an authority figure.

After the recording was played, Mrs. Sherrill testified that her memory was better on the day of the Defendant's trial than it had been at the time of the recording because she was "away from his crap." She said that she had "memory lapses" and that she was scared when she gave the statement. She said the Defendant had told her that if she went to law enforcement, "he was going to come and get" her. She said that at the time of the statement, the Defendant had "started coming around wanting to see the kids," even though he was not supposed to come to her home. She said the Defendant had threatened to take the victim's brother from her. She acknowledged that her trial testimony was not entirely consistent with the recorded statement but said she remembered what had happened "like it was yesterday." She said her trial testimony was truthful. She said that she knew having sex with the victim was wrong but that she had done it because she thought her life and that of her children were in danger. She said that she would not have had sex with her child absent the Defendant's insistence.

Thomas Harrison, a Wayne County school psychologist, testified that he worked with the special education department. He said he had known the victim since the victim was in kindergarten. He said that he gave the victim a WISC-IV IQ test in 2011, when the victim was in ninth grade, which showed that the victim had a full-scale intelligence score of 48. Mr. Harrison said that a score of 70 or less was an indicator of potential intellectual disability. He said that after he obtained this test result, he conducted an adaptive behavior interview with Mrs. Sherrill and that the scores were consistent with the test administered to the victim. Mr. Harrison did not recall having ever met the Defendant. Mr. Harrison said that, at various times, the victim completed other intelligence tests. He agreed that the victim scored 66 on the KABC test and that the victim scored 58 and 46 on two administrations of the VMI test. Mr. Harrison said the victim had an attention deficit hyperactivity disorder (ADHD) diagnosis from an

unidentified source outside the school system. Mr. Harrison testified that the victim "definitely" had an intellectual disability, which Mr. Harrison characterized as "within the mild/moderate range." Mr. Harrison said the victim functioned cognitively and adaptively as an elementary school student, rather than a high school student.

Mr. Harrison said that, in his opinion, the victim had the ability to understand right and wrong. He said, however, that people with intellectual disabilities were "susceptible to authority figures" and tended to want to please people in authority. He said people with intellectual disabilities might be able to identify whether an action was right or wrong but might have difficulty explaining why it was right or wrong. Mr. Harrison thought that if someone in authority told the victim to do something, the victim might do it, even if the victim did not think the action was right. In Mr. Harrison's opinion, the victim "has a very strong sense of wanting others to see him in a good light." Mr. Harrison said that the victim was "very much a pleaser" and that the victim would echo things to a person that he thought the person wanted to hear.

Twenty-Second Judicial District Attorney General's Investigator Tommy Goetz testified that he became involved with the Defendant's case after the district attorney general's office received a call from Erica Prince, a Department of Children's Services employee, regarding a report that Mrs. Sherrill had sexual intercourse with the victim. He said he understood, as well, that the Defendant had alleged that Mrs. Sherrill had sex with her boyfriend in front of the victim and the victim's brother. Investigator Goetz said that as a result of the call, he went to Kid's Place, a children's advocacy center. He said Kid's Place conducted forensic interviews of children and intellectually disabled individuals who were alleged victims of abuse. Investigator Goetz said that, at Kid's Place, he observed the forensic interview of the victim.

Investigator Goetz testified that after he observed the victim's forensic interview, he conducted a video-recorded interview of Mrs. Sherrill at the Lawrenceburg Police Department. He said, however, "[T]here was a glitch in the system and the first half of the video was just lost. It has to be a problem with the software." He said he had not realized the issue existed until the district attorney's office brought it to his attention. He said he attempted to have information technology personnel retrieve the entire video but that the first half could not be recovered.

Investigator Goetz said that on July 8, 2015, the morning after Mrs. Sherrill's interview, the Defendant appeared voluntarily for an interview. Investigator Goetz said Ms. Prince had called the Defendant and asked him to come to the sheriff's department for an interview. Investigator Goetz said the Defendant waived his *Miranda* rights and agreed to speak with him. Investigator Goetz said he advised the Defendant that depending on the course of the investigation, Investigator Goetz might want to "seize" the Defendant's cell phone. Investigator Goetz said the Defendant claimed he had lost

his cell phone in the time since he had been called at 10:30 the previous evening about coming for an interview. Investigator Goetz said the Defendant consented for the police "to go ping over his phone and search for the cell phone." Investigator Goetz said that when he advised the Defendant of the complaint that had been lodged, the Defendant said, "[T]hat's the first I've heard of that, I want a lawyer." Investigator Goetz said he did not question the Defendant after the Defendant requested an attorney.

Investigator Goetz testified that he, Deputy Jeff Dunn, and one or two other Lawrence County Sheriff's deputies searched the Defendant's home and the area outside the home after the Defendant signed a consent form. Investigator Goetz said they found a cell phone charger in the living room but did not find a cell phone in the house. He said they searched a field, the driveway, and a truck for the cell phone. He said, "[I]t was a track phone so we could not ping it."

Investigator Goetz testified that Mrs. Sherrill stated she had reported having sex with her children to "her legal aid and her counselor." He did not recall, however, her saying she had reported it to law enforcement before he interviewed her. He said that if sexual abuse had been reported to a law enforcement agency, the agency would have been required to investigate it. He said the dates of the incidents were identified by referring to the date Mrs. Sherrill had left the marital home, which occurred a few days after the incidents.

Investigator Goetz testified that he thought he interviewed the Defendant at the Lawrenceburg Police Department, although he said the interview might have occurred at the Lawrence County Sheriff's Department. He said that if the interview had occurred at the Lawrenceburg Police Department, a video recording would have been made using their equipment and that if the interview had occurred at the sheriff's department, he would have used his digital audio recorder to record the interview. He said, "I can't fathom that I would interview him and it not be recorded." He agreed there should be a recording of the interview.

The victim testified that he was twenty years old. He said he was enrolled at Waynesboro High School. He said he attended school in Lawrenceburg previously, that he graduated, and that "they let [him] go back to school and learn about a lot of stuff." He said he would graduate in Waynesboro, although he did not know when.

The victim testified that he had lived in Collinwood with his father, his mother, his brother, and his dog when "[b]ad things happened." He said his father was upset and mad at him and his mother, that his father threw things at him and his mother, and that his father was mad at his mother for going out with her friends.

-9-

The victim said that his father told him and his mother "to do something really bad." He said his father told him to take off his shirt. He said he sat between his parents on the bed. He said he kissed his mother goodnight. He said that his mother was going to sleep and that he and his father went to the kitchen because they were hungry. He agreed that this was not the same version of events he had reported in a video recording made at Kid's Place Child Advocacy Center. He said he had been truthful in his testimony and at the Child Advocacy Center and that these events had occurred on different days. When asked about what he had said at the Child Advocacy Center, he said he had been watching a movie in bed with his mother and that they fell asleep.

The victim agreed he had sex with his mother and said it occurred two times. He said the first incident occurred in his parents' bedroom. He said he went in the room to say goodnight to his mother. He said his mother was fully clothed and in bed. He said that his parents started arguing and that he told his father to stop. The victim said he was embarrassed and that he took off his clothes at his mother's instruction. He said his father was "[j]ust standing there." He said he got into the bed. He said his mother disrobed and got into bed with him. He said he and his mother had sex and that he did not like it. He said the sexual activity embarrassed his mother. He said his mother was on top. When asked which of their body parts touched, he replied, "Everything." He said his "thing" went inside his mother's female part. He said his mother moved up and down. He said the activity lasted about six minutes. He said his father was in the bed with them and that his father was asleep. He then said his father was in the bathroom while he and his mother had sex and that his father stated he did not like it. He said his father was mad and said "bad things" to his mother, accusing her of being "a horrible person" and "going out with different guys." The victim thought the sexual activity had been his mother's idea, but he then said he did not know. He said they stopped having sex, dressed, and went to bed. The victim said his mother was upset and cried during the sexual activity and that his father did nothing to stop the activity. He said that when his father was in the bathroom "fussing at" his mother, his father was using a cell phone to send text messages.

The victim testified relative to the second incident that he went into his parents' bedroom to tell his mother goodnight. He said that both parents were in the room and that his father wanted him to have sex with his mother. He initially said he did not recall why he took off his clothes but said he had not wanted to undress. He later agreed that his father told him to remove his clothes. He said his mother undressed. He said he and his mother were embarrassed. When asked why they engaged in the activity despite their embarrassment, he said, "I have no clue." He said they had sexual intercourse on the bed with his mother on top. He said that his male part went inside her female part but that there was no movement. He said his mother was upset and crying. He said the incident lasted about five hours. He said his father "came back," but he did not state where his father had been. He later testified that his father had not been in the room during the

-10-

second encounter but that he could hear his father in the bathroom. He thought his father got into the bed with him and his mother, and he said his father told him goodnight.

The victim acknowledged that he told a female "Buffalo River Valley" employee that his father "didn't have anything to do with this."

The Defendant did not offer proof. The jury found the Defendant guilty of two counts of incest and two counts of rape. Each of the jury's findings of guilt was based upon a theory of criminal responsibility.

**I**

**<u>Sufficiency of the Evidence</u>**

The Defendant contends that the evidence is insufficient to support his convictions because (1) the victim's testimony failed to show that the Defendant was in the room when the offenses occurred and (2) the State failed to show that the Defendant was aware of the degree of the victim's intellectual disability. The State responds that the evidence is sufficient to support the convictions. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

### A. <u>Rape</u>

As relevant to this case, "Rape is unlawful sexual penetration of a victim by the defendant or of the defendant by a victim [where] . . . [t]he defendant knows or has

reason to know that the victim is mentally defective, mentally incapacitated or physically helpless[.]" *Id.* § 39-13-502(a)(3). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" *Id.* § 39-13-501(7) (2014). "'Mentally defective' means that a person suffers from a mental disease or defect which renders that person temporarily or permanently incapable of appraising the nature of the person's conduct[.]" *Id.* § 39-13-501(3).

"Criminal responsibility, while not a separate crime, is an alternative theory under which the State may establish guilt based upon the conduct of another." *State v. Dorantes*, 331 S.W.3d 370, 386 (Tenn. 2011) (quoting *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999)).

> A person is criminally responsible for an offense committed by the conduct of another, if:
>
> . . .
>
> (2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]

T.C.A. § 39-11-402 (2014). For a defendant to be convicted of a crime under the theory of criminal responsibility, the "evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." *Dorantes*, 331 S.W.3d at 386; *see State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994).

The Defendant's argument focuses on the victim's testimony, which the Defendant argues failed to show that the Defendant was in the room when the offenses occurred, and on the sufficiency of the State's proof that the Defendant was aware of the degree of the victim's intellectual disability. Our review encompasses all of the evidence, which included Mrs. Sherrill's testimony about the offenses in addition to that of the victim. Viewed in the light most favorable to the State, the evidence shows that the Defendant demanded that Mrs. Sherrill have sex with the victim on or about June 3, 2014. Mrs. Sherrill testified that when she tried to walk away, the Defendant threatened to hit and kill her. She said the Defendant stood beside the bed and told her that she "better make [the victim] feel good" and that the victim had "better enjoy it." She said the Defendant asked if she enjoyed the sex and made comments about the victim's size. She said the Defendant instructed the victim how to touch her "because that's what a woman likes." She said the victim's penis penetrated her vagina.

The victim testified relative to the first incident that he went into his parents' bedroom and that his parents argued. He said he took off his clothes at his mother's instruction, that his father was "[j]ust standing there," that his mother disrobed, and that they had sex with his mother on top. He said his "thing" went inside his mother's female part. Although he stated that his father was "standing there" when this occurred, he later said his father was in the bathroom "fussing at" his mother and sending text messages. He said that his mother was upset and cried during the sexual activity.

Relative to the second incident on or about June 5, 2014, Mrs. Sherrill testified that she initially refused the Defendant's demand that she have sex with the victim, that the Defendant pushed her into the bathtub, causing her to hit her head, that the Defendant told her she was "going to do it again," and that she complied. She said she went into the bedroom and had sex with the victim on top. She said the Defendant filmed the incident with a cell phone. Mrs. Sherrill said the Defendant had wanted her to have sex with the victim in order to instruct him in how to be a man and please a woman.

The victim testified relative to the second incident that the Defendant wanted him to have sex with his mother. He said that his father told him to undress and that he did so against his wishes. He said that he and his mother were embarrassed and that they had sexual intercourse on the bed with his mother on top. He said his male part went inside her female part. He said that the Defendant "came back" into the room and that he could hear the Defendant in the bathroom during the sexual encounter. He said his mother was upset and crying during the encounter.

Pertinent to the incidents generally, Mrs. Sherrill testified that she would not have had sex with her child absent the Defendant's insistence. She said, as well, that the victim was intellectually disabled and had ADHD, that he had an IEP plan at school, that the Defendant knew the victim received a Social Security Disability check, and that the Defendant took her to the victim's school for the IEP meetings.

Mr. Harrison testified that the victim had tested as intellectually disabled on several occasions. Mr. Harrison said the victim functioned cognitively and adaptively on the level of an elementary school student. Mr. Harrison said that individuals with intellectual disabilities such as the victim's were susceptible to authority figures and wanted to please authority figures.

Because the victim testified, the jury had the opportunity to evaluate, from a layperson's perspective, the extent to which his intellectual disability would have been apparent to the Defendant. The victim and the Defendant lived in the same household until shortly after the offenses. The Defendant was the victim's father, and the victim, who was eighteen at the time of the offenses, had received Social Security disability

-13-

payments since around the time he started school. The Defendant took Mrs. Sherrill to the victim's school for IEP meetings related to the victim's intellectual disability and school progress.

The State acknowledges that the victim's testimony was not clear in some respects, which it attributes to his intellectual disability. Mrs. Sherrill's testimony, however, was more precise, and the victim's testimony provides sufficient corroboration of her account of the offenses. *See, e.g., State v. Fowler*, 373 S.W.2d 460, 463 (Tenn. 1963) ("[T]here must be some fact testified to entirely independent of an accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but that the defendant is implicated in it, and the corroboration must consist of some fact that affects the identity of the party accused."). The victim's testimony provided corroboration of Mrs. Sherrill's account of the Defendant's promotion, encouragement, and coercion of the offenses and of the Defendant's identity.

We conclude that the evidence is sufficient to support the Defendant's rape convictions. The proof shows that Mrs. Sherrill and the victim engaged in sexual penetration, that the victim was mentally incapacitated by his intellectual disability to an extent that he was incapable of consenting, that the victim's cognitive and adaptive deficits were significant and apparent, that the Defendant lived in the same home, and that the victim was susceptible to influence from authority figures. The proof also shows that the Defendant promoted the commission of the offenses by directing and intimidating Mrs. Sherrill into engaging in sexual activity with the victim. Thus, the evidence supports the jury's conclusions that the Defendant is criminally responsible for the rapes of the victim.

## B.    <u>Incest</u>

As pertinent to this appeal, "A person commits incest who engages in sexual penetration as defined in § 39-13-501, with a person, knowing the person to be, without regard to legitimacy: . . . The person's natural parent, child, grandparent, grandchild, uncle, aunt, nephew, niece, stepparent, stepchild, adoptive parent, adoptive child[.]" T.C.A. § 39-15-302(a)(1).

Viewed in the light most favorable to the State, the evidence shows that Mrs. Sherrill engaged in two acts of sexual intercourse with the victim, who was her natural child. The evidence likewise shows that she did so at the insistence of the Defendant, who threatened her and, on the second occasion, assaulted her. The evidence is sufficient to support the Defendant's convictions of incest under a criminal responsibility theory.

Because the evidence is sufficient to support the convictions, the Defendant is not entitled to relief on this basis.

## II

### *Brady* **Issues**

The Defendant contends that the trial court erred in denying his claim pursuant to *Brady v. Maryland* based upon the State's failure to disclose (1) an alleged incentive of a 30% release eligibility, rather than 100%, offered to Mrs. Sherrill as part of the plea agreement, in exchange for her testifying against him and (2) her charge and subsequent plea agreement in a neighboring county to an offense involving sexual conduct with the victim's brother. The Defendant also contends that the court erred in concluding that a *Brady* violation occurred but nevertheless denying relief on the basis of "harmless error." The State contends that the court did not err in denying relief. We agree with the State.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. *See Johnson v. State*, 38 S.W.3d 52, 55 (Tenn. 2001). As a result, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to his guilt or lack thereof or to the potential punishment faced by a defendant. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963).

In order to show a due process violation pursuant to *Brady*, the defendant must prove by a preponderance of the evidence that (1) he requested the information, unless it is obviously exculpatory, (2) the State must have suppressed the information, (3) the information must be favorable to the accused, and (4) the information must be material. *State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). Favorable evidence includes that which "challenges the credibility of a key prosecution witness." *Johnson*, 38 S.W.3d at 56-57 (internal quotation marks and citation omitted). Evidence is material when "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* at 58 (quoting *Edgin*, 902 S.W.2d at 390).

Evidence that provides value for impeachment of a state's witness is within the purview of *Brady*. *State v. Jackson*, 444 S.W.3d 554 (Tenn. 2014); *see United States v. Bagley*, 473 U.S. 667, 767 (1985); *Giglio v. United States*, 405 U.S. 150, 154 (1972).

The critical inquiry remains, though, whether the evidence was material. In this regard, the inquiry is whether a reasonable probability exists that "had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995); *see Edgin*, 902 S.W.2d at 391 (op. on pet. for reh'g).

In *Kyles*, the Supreme Court observed:

[The] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678); *see Jackson*, 444 S.W.3d at 595.

The Defendant was charged in Wayne County with the offenses related to the victim that are the subject of this appeal. Mrs. Sherrill was similarly charged in Wayne County with offenses involving the victim, and she reached a plea agreement with the State relative to disposition of these charges and which contemplated her truthful testimony at the Defendant's trial. Mrs. Sherrill was also charged with Lawrence County offenses related to the victim's brother. The Defendant was not charged with any Lawrence County offenses related to the victim's brother. The Defendant claims he was unaware of a plea agreement the State and Mrs. Sherrill entered into relative to the Lawrence County offenses.

Evidence regarding the charges and the existence and terms of the plea agreements was received at the hearing on the motion for a new trial. Investigator Goetz testified that he was told initially that DCS had received a referral regarding an allegation that Mrs. Sherrill was having sex in front of the victim and the victim's brother but that DCS employee Erica Prince called Mrs. Sherrill, who said she had engaged in sexual activity with the victim and the victim's brother. He said both the victim and the victim's brother participated in a forensic interview before Mrs. Sherrill's police interview. He said that the victim's brother "was really all over the place during the interview" and that he did not recall if the victim's brother made any statements about sexual acts. Investigator Goetz said that he did not think the victim's brother comprehended what was going on but that the victim was able to corroborate Mrs. Sherrill's statement to Ms. Prince that Mrs. Sherrill had engaged in sexual activity with the victim in the Defendant's presence.

Investigator Goetz testified that the report he prepared about the interview of Mrs. Sherrill was consistent with what she said in the recording. The report was received as an exhibit. The report contains the following relative to sexual conduct involving the victim's brother:

During the interview[, Mrs. Sherrill] stated that some months before [the June 3 and 5, 2014 incidents with the victim,] that she was lying in bed and her youngest son, [the victim's brother] was lying on her left arm and [the Defendant] on her right side. [The Defendant] began playing with her breast and had [the victim's brother] get between her legs and that [the Defendant] help[ed] show [the victim's brother] how to get an erection and told [the victim's brother] to put it in his mother and she stated that [the victim's brother] did go inside her but after a minute she pushed him off and stated this isn't right and went outside.

Investigator Goetz testified that the only home address for the Sherrill family listed in his report was in Wayne County. He said Mrs. Sherrill was not charged with an offense involving the victim's brother in Wayne County because the offense she described involving the victim's brother occurred in Lawrence County. He said he was able to "somewhat corroborate" Mrs. Sherrill's statement about the incident with the victim's brother because she said the police had been called on the same night to a home in Lawrence County in which the family was living at the time. He said he was able to determine the date and time that the police had responded. He said no offense had been presented to the Lawrence County Grand Jury regarding the Defendant because he had been unable to corroborate Mrs. Sherrill's statement that the Defendant had been present during the sexual activity between Mrs. Sherrill and the victim's brother in Lawrence County.

Investigator Goetz agreed that, as a result of the investigation, two people were indicted in Wayne County and one in Lawrence County. He said the address identified in his report was the Sherrill marital home in Wayne County. He said that the Lawrence County offense involving Mrs. Sherrill and the victim's brother was corroborated as to Mrs. Sherrill's involvement because she said it had occurred on the same night as law enforcement officers were called to the marital home in Lawrence County regarding a domestic disturbance and that he was able to determine the date and nature of the police response to the home. He agreed that the Defendant had been arrested for domestic assault and said that, to the best of his recollection, the report filed relative to the incident did not mention Mrs. Sherrill having had sex with the victim's brother.

Assistant Public Defender Hershell Koger, who was Mrs. Sherrill's defense counsel, testified that Mrs. Sherrill was charged with aggravated rape, a Class A felony, which required a fifteen to twenty-five-year sentence to be served at 100% but that everyone involved in the plea agreement believed that the offenses to which Mrs. Sherrill pleaded guilty meant the greatest individual sentence she would receive was twelve years at 30%, although she still faced the possibility of consecutive sentencing. He agreed that Mrs. Sherrill agreed to testify against the Defendant as a State's witness. He said the plea discussions covered Mrs. Sherrill's charges in both Wayne and Lawrence Counties. He

said that, sometime after the Defendant's trial, he spoke with the prosecutor, who advised him that Mrs. Sherrill would not receive a sentence with 30% release eligibility for rape. He said he confirmed that the law required this and filed a motion to withdraw or amend the guilty plea.

Mr. Koger testified that the defense team filed a motion to withdraw Mrs. Sherrill's guilty plea or, in the alternative, to amend the guilty plea to reflect a change in the rape offenses in Wayne County. A copy of the motion was received as an exhibit. Mr. Koger said that the motion stated that the plea agreement had been premised upon the parties' intent that Mrs. Sherrill be sentenced as a Range I offender with 30% release eligibility and that the parties believed at the time the agreement was reached that none of the offenses to which Mrs. Sherrill pleaded guilty were subject to a more onerous sentencing scheme. He said there was no agreement as to the number of years that Mrs. Sherrill would serve.

Mr. Koger testified that the trial court agreed to allow the parties to amend the guilty plea to the offense of rape to reflect a guilty plea to the offense of facilitation of aggravated rape. Mr. Koger said this permitted Mrs. Sherrill to have a B felony conviction with 30% release eligibility, which had been the original intent. He said that, on the date of the motion hearing, the parties were able to reach a further agreement as to the length of the sentence, which was ten years. He said the court accepted the agreement as to the length of the sentence. He acknowledged that the trial judge made comments concerning Mrs. Sherrill and the Defendant receiving comparably equitable sentences. He said that, ultimately, the judge reviewed the matter, stated he was satisfied, and "took the plea." When asked if Mrs. Sherrill received a benefit for testifying against the Defendant, Mr. Koger said, "Her benefit was the open plea."

At the hearing on the motion for a new trial, the Defendant's counsel stated that he had not been aware of Mrs. Sherrill's Lawrence County charge and guilty plea until after the Defendant's trial. He acknowledged, however, that he had received the report prepared by Investigator Goetz which summarized Mrs. Sherrill's account of the Lawrence County incident involving the victim's brother.

## A.      Trial Court's Use of Harmless Error Analysis

We address, first, the Defendant's argument that the trial court erroneously analyzed the *Brady* issues by utilizing a harmless error standard. As we have stated, *Edgin* provides the framework to be applied in determining whether a *Brady* violation has occurred. *See Edgin*, 902 S.W.2d at 389. At the hearing on the motion for a new trial, the court did not employ the *Edgin* criteria and, instead, noted the following:

> [W]e all know that in the Appellate Courts they sometimes find an error in the Trial Court and then they move on to evaluate whether or not that error was harmless beyond a reasonable doubt. I don't know whether -- I'm not used to doing that at the trial level, but I do think based on some other procedures that are somewhat similar, this Court must decide whether it makes any difference or not. For example, what if there was a *Brady* violation? And I'm not suggesting that [the prosecutor] would intentionally violate *Brady*, but what if they failed to disclose something that you would not under any circumstance have used anyway during the trial, is it therefore harmless and does not justify a new trial?

At a later point in the hearing, the court found that information regarding Mrs. Sherrill's Lawrence County guilty plea "could be *Brady* material" but that the State's lack of disclosure of the information was "harmless beyond a reasonable doubt." The court did not specifically reference harmless error in resolving the *Brady* claim related to Mrs. Sherrill's release eligibility pursuant to the Wayne County plea agreement, but it also did not reference the *Edgin* factors.

When a defendant establishes the existence of all four *Edgin* factors, he "has inherently established that the violation was not harmless; thus, a separate harmless error analysis is unnecessary and inappropriate." *Jackson*, 444 S.W.3d at 595; *see also Kyles*, 514 U.S. at 435. The record reflects that the trial court did not utilize the required *Edgin* framework for determining whether *Brady* violations had occurred. We will review the *Brady* issues through the *Edgin* framework to determine whether the Defendant is entitled to relief.

## B.      30% Release Eligibility in Wayne County Plea Agreement

The Defendant argues that the State failed to disclose its Wayne County agreement with Mrs. Sherrill for 30% release eligibility in exchange for her testimony against him. In denying the motion for a new trial, the trial court stated the following:

> I believe when [the prosecutor and Mrs. Sherrill's counsel] appeared before me to modify [Mrs. Sherrill's] judgment and sentence so that she would have an effective 30 percent release eligibility instead of 100 percent release eligibility, you changed the agreement with her, and between the two sides her charge from a rape to an attempt to commit an aggravated rape;[4] is that correct? So that the years of service were the same, but the release eligibility was less.

---

[4] The prosecutor advised the court that the conviction offense was facilitation of aggravated rape, rather than attempted aggravated rape.

-19-

. . .

I've addressed already the difference between 100 percent and 30 percent. But I've not specifically addressed that [defense counsel] might have some impeachment points by cross examining Jennifer Sherrill on the fact that she had a 30 percent agreement instead of [a] 100 percent agreement. But of course, she didn't . . . effectively have a 30 percent agreement at that time, even though the two lawyers understood that she was getting a 30 percent agreement because both of them were thinking about the Statute before rape was added to that list of 85 percent cases. And the Court will acknowledge that it might have made some difference to [the] triers of fact especially if they were still sentencing as they did in Tennessee before the 1982 changes in the law. I think back when juries set the sentence if they knew that one co-defendant, especially a so called hands-on codefendant, was getting 30 percent release eligibility they might have wanted to give [the Defendant] a 30 percent release eligibility too. But the difference is they are not permitted under current law to know about what the length of the sentence is, what the range of the sentence is and what percentage of sentence you have to serve before you are eligible for parole, so none of those things would have been known to the jury. Even if you were able to ask, "did the State give you 30 percent release eligibility instead of 100 percent release eligibility," the jury would not have been allowed to know that [the Defendant] was not going to get a 30 percent release eligibility. Those are just not jury questions under current Tennessee law.

We begin by noting the trial court's finding that the evidence had potential impeachment value. As we have stated, impeachment evidence falls within the purview of *Brady*. *See Jackson*, 444 S.W.3d 554. Turning to the *Edgin* factors, we note that the Defendant filed a discovery request which specifically requested the disclosure of *Brady* materials. *See Edgin*, 902 S.W.2d at 389 (stating that a defendant must request the information, absent obvious exculpatory character). The record reflects that the defense was aware of Mrs. Sherrill's Wayne County plea agreement; that the State, Mrs. Sherrill, and her counsel were under the mistaken impression that she would receive 30% release eligibility for the rape convictions; and that the release percentage was not specified in the original written guilty plea petition. The State did not disclose the mistaken impression regarding the release eligibility, although it was unaware until after the Defendant's trial that the parties to Mrs. Sherrill's plea agreement had been mistaken about the permissible release eligibility percentage that was available for the offenses to which she was pleading guilty. *See id.* (stating that the State must have suppressed the information). The information was favorable in the sense that it provided impeachment

-20-

evidence. *See id.* (stating that the information must be favorable to the accused). In any event, the evidence was not material. The jury knew from Mrs. Sherrill's testimony that she had a plea agreement with the State. Her counsel testified that the benefit she received was the plea agreement itself and not an illegal and unenforceable release eligibility percentage in exchange for her testimony. As the trial court noted, the sentencing terms to which the Defendant might be subject would have been inadmissible. Any additional impeachment value that the Defendant might derive from impeachment about the specifics of the agreement would have been *de minimus* and not material. *See id.* (stating that the information must be material). Despite its failure to conduct an *Edgin* analysis, the trial court did not err in denying the Defendant's *Brady* claim as to the mistake regarding 30% release eligibility pursuant to Mrs. Sherrill's original plea agreement.

### C.    Lawrence County Charge and Plea Agreement

The Defendant argues that the State's nondisclosure of Mrs. Sherrill's Lawrence County charge involving the victim's brother and the plea agreement disposing of this charge deprived the Defendant of the opportunity to cross-examine her about her propensity to commit an offense of a similar nature without the Defendant's involvement. In resolving the issue, the trial court stated the following:

> . . . I do think [the information about Mrs. Sherrill's Lawrence County charge and guilty plea] is in the *Brady* category of information which if not disclosed might justify some significant relief for [the Defendant].
>
> But the Court finds that the defendant, or at least his counsel . . . , had what is now Exhibit A, the investigation report by Investigator Goetz that evidenced sexual conduct between Jennifer Sherrill and the younger child [the victim's brother]; for which she was indicted and pled guilty in Lawrence County, separate and apart from the sexual conduct she engaged in with the older child [the victim] in Wayne County. I can see where [defense counsel] perceived back on February 22nd[5] that the conduct she was pleading to in Lawrence County may have occurred at the Lawrenceburg Housing Authority Apartments after [the Defendant] was out of the picture. He could have reasonably inferred that. And if that in fact had occurred it would have been powerful cross examination of Jennifer Sherrill when she claimed that her husband was forcing her to have sex with [the victim] in front of that Lawrence County – I mean in front of this Wayne County jury to have been able to ask her, "well, didn't you after [the

---

[5] The motion for a new trial was filed on February 22, 2017.

Defendant] was totally out of the picture, have sex with one or both children while you lived at the Lawrenceburg Housing Authority Apartments?"

But now with Mr. Goetz['s] testimony today and explanation of what Exhibit A means, and where that page two paragraph event with [the victim's brother] actually occurred as he learned in further investigation and confirming with incident reports from the Lawrence County Sheriff's Department what [defense counsel] saw did not make it clear what exactly happened, when and where. And I think he had reason as I've said already on February 22nd to believe that the Lawrence County crime of Jennifer Sherrill occurred after [the Defendant] was out of the picture.

But today, we now learned that [defense counsel] did have knowledge of Jennifer Sherrill having sexual intercourse with [the victim's brother]. But now, we also learned that according to Jennifer Sherrill, [the Defendant] was present at that time. So, the Court today is inclined to believe that the State had provided factual information about the event which led to the Lawrence County indictment even if it did not specifically call to [defense counsel's] attention that that act had resulted in not only [an] indictment, but a guilty plea by Jennifer Sherrill in Lawrence County in October of 2016 before [the Defendant] went to trial in December of 2016 in Wayne County. And certainly before Jennifer Sherrill testified against him in that December trial. Good lawyering but with a misperception of the fact that the [the victim's brother's] incident was the one and only incident that Jennifer admitted, was charged with or pled guilty to. I don't think the defendant is entitled . . . to any relief on *Brady* material.

. . . .

. . . You understand that I'm finding the [Lawrence County] guilty plea could be *Brady* material. What I'm finding though is that the State's failure to inform you of that guilty plea is harmless beyond a reasonable doubt. Now, if that is the wrong standard for the Court to be applying, they can fix it in the Appellate Courts.

Although the trial court did not employ the *Edgin* framework, it found that Mrs. Sherrill's Lawrence County charge and guilty plea to a sexual offense against the victim's brother was potential relevant impeachment evidence. We acknowledge that conviction of a crime may be relevant impeachment evidence for cross-examination of a State's witness. In this case, however, the Defendant argues that the information

-22-

regarding the Lawrence County offense was relevant to show that, despite Mrs. Sherrill's testimony that the Defendant forced her to have sex with the victim, she had a propensity to commit offenses against the children without the Defendant's involvement. The Defendant's argument regarding the relevance of the information relies upon a faulty factual premise. As Investigator Goetz testified at the motion for a new trial hearing, the Lawrence County incident involving the victim's brother for which Mrs. Sherrill was indicted and pleaded guilty occurred when the Defendant lived with the family in Lawrence County, and the Defendant was implicated and avoided being charged only because Investigator Goetz could not establish corroboration of Mrs. Sherrill's statement that the Defendant was involved. The Defendant has not shown that this information was potentially relevant impeachment evidence. *See id.*

Despite this conclusion, we will analyze the remaining *Edgin* factors. As we stated previously, the record reflects that the Defendant requested *Brady* information. *See Edgin*, 902 S.W.2d at 389. Although the defense received the report which referenced the incident which led to the Lawrence County charge and guilty plea, the State did not disclose the existence of the charge and the plea. *Id.* As we have noted, the information was not favorable to the Defendant, nor was it material. *See id.* The evidence did not hold value in demonstrating that Mrs. Sherrill had a propensity to commit sexual offenses against her children without the Defendant's involvement.

Despite the trial court's failure to analyze the Defendant's *Brady* claims properly, the court nevertheless reached the correct result in denying the claims. The Defendant is not entitled to relief on this basis.

### III

### Missing Evidence

The Defendant contends that the trial court erred in denying his motions to dismiss pursuant to *State v. Ferguson* based upon the partial loss of the recording of Mrs. Sherrill's investigative interview and the loss of any recording of the Defendant's investigative interview. The State responds that the court did not err in denying the dismissal motions. We agree with the State.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. *See Johnson v. State*, 38 S.W.3d 52, 55 (Tenn. 2001). As a result, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to his guilt or lack thereof or to the potential punishment faced by a defendant. *See Brady*, 373 U.S. at 87.

-23-

Our supreme court has held that the State has a duty to preserve discoverable evidence when the evidence

> might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*State v. Ferguson*, 2 S.W.3d 912, 917 (Tenn. 1999) (quoting *California v. Trombetta*, 467 U.S. 479, 488-89 (1984)); *see* Tenn. R. Crim. P. 16 (discoverable evidence); *see also State v. Merriman*, 410 S.W.3d 770, 779 (Tenn. 2013). The supreme court has said that the proper inquiry involves, first, determination of whether the State had a duty to preserve the evidence. *Ferguson*, 2 S.W.3d at 917. This duty to preserve applies to "potentially exculpatory" evidence. *Merriman*, 410 S.W.3d at 793 (citing *Ferguson*, 2 S.W.3d at 917). If the State failed to fulfill the duty, three factors must be considered:

1. The degree of negligence involved;

2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

3. The sufficiency of the other evidence used at trial to support the conviction.

*Id.* The supreme court has said that in evaluating these factors:

> [T]he central objective is to protect the defendant's right to a fundamentally fair trial. If, after considering all the factors, the trial judge concludes that a trial without the missing evidence would not be fundamentally fair, then the trial court may dismiss the charges. Dismissal is, however, but one of the trial judge's options. The trial judge may craft such orders as may be appropriate to protect the defendant's fair trial rights. As an example, the trial judge may determine, under the facts and circumstances of the case, that the defendant's rights would best be protected by a jury instruction.

*Id.* A trial court's application of the *Ferguson* factors involves a constitutional issue, and our supreme court has concluded that the proper standard of review on appeal concerning the fundamental fairness of a trial is de novo. *Merriman*, 410 S.W.3d at 791.

The trial court held a pretrial hearing on the Defendant's motion to dismiss based upon the partial loss of the recording of Mrs. Sherrill's investigative statement. The defense did not offer evidence pertinent to the issue, although the parties generally agreed for purposes of their arguments that a recording of a portion of the interview was unavailable due to a computer "glitch" but that the defense had received Investigator Goetz's written account of the interview. The defense argued that it was unable to prepare adequately without knowing Mrs. Sherrill's exact words about the offenses and that Investigator Goetz's secondhand account and subjective interpretation of Mrs. Sherrill's statement were inadequate. The court denied the motion to dismiss without stating its rationale. At the trial, the court instructed the jury that a portion of the recording of Mrs. Sherrill's investigative interview had been lost due to "some sort of computer defect."

As we have stated previously, Investigator Goetz testified at the trial that he thought his interview of the Defendant had been recorded. In a jury-out hearing, the court asked whether an inquiry "into anything about discovery and *Ferguson* related matters about whether or not there was a recording of [the Defendant]" was necessary. Defense counsel stated, "I've spoken with the Attorney General, and in all candor to the Court, outside of the [*Ferguson*] jury instruction that the Court has already indicated it's going to give, I don't know any other remedy that's available."[6] Investigator Goetz stated during the jury-out hearing that it was possible he might not have asked for a copy of a video recording and that no recording existed on his digital audio recorder, meaning that he had not used the audio recorder. After the close of the proof, the court gave a jury instruction which informed the jury of the State's obligation to gather, preserve, and produce evidence which may have exculpatory value, and which informed the jury that it if it found that the State had failed to fulfill its duties, the jury could infer that the missing evidence was favorable to the Defendant.

At the motion for a new trial hearing, Investigator Goetz testified that he prepared a four-page report in the course of his investigation of sexual abuse allegations involving the victim and the victim's brother. The report was received as an exhibit. He said that he interviewed Mrs. Sherrill on July 7 of an unidentified year at the Lawrenceburg Police Department. He said Captain Don Laws was present, as well. He said the interview took place in a room which had audio/visual recording equipment. He said, "[A]t the end of

---

[6] The Defendant claims in his appellate brief that, at the trial, he made a motion to dismiss based upon the failure to provide the recording of the Defendant's statement. The volume and page the Defendant references in his brief fails to reflect that defense counsel made a motion to dismiss on this basis. Our review of the trial transcript reflects only the statement we have quoted above, which we do not view as a motion to dismiss. Nevertheless, the motion for a new trial alleged, in reference to the nondisclosure of any recording of the Defendant's interview, that the court erred "in not granting Defendant's Motion to Dismiss on its own volition when it became known during the trial that more than the previously mentioned video interview [of Mrs. Sherrill] was missing."

the interview they burned me, I believe two cd's and I turned those into my file and it was at a later date that I learned that they didn't work." He said he learned that the first part of the interview had not been recorded due to a "software glitch." He said he had not viewed the recording immediately after it was made and had not realized the issue existed until later.

Investigator Goetz testified at the hearing that he had not noted on his report that his interview of the Defendant had been recorded. He said that his practice was to note on his report whether an interview was audio or video recorded. He said that if he did not make a notation, this meant the interview had not been recorded. He said he had checked his digital recorder, which he used if other recording equipment were unavailable, and that he did not have a recording of the Defendant's interview. Investigator Goetz said that he "felt like" he had interviewed the Defendant in the Lawrenceburg Police Department's room equipped with a recording device. Investigator Goetz said, however, that he "misspoke" at the Defendant's trial and that the absence of a notation that the interview had been recorded indicated that the Defendant's interview had not been recorded.

Mr. Hershell Koger testified at the motion for a new trial hearing that he and another attorney represented Mrs. Sherrill in the Wayne and Lawrence County prosecutions. Mr. Koger agreed that he had been the person who discovered that the first part of the recording of Mrs. Sherrill's police interview was "corrupt." He said that, had the judge asked if he would make Mrs. Sherrill available to the Defendant's counsel in order to investigate what she may have said during the missing portion of the recording, he would have refused.

### A.     Mrs. Sherrill's Interview

The Defendant contends that the trial court erred in denying his motion to dismiss based upon the partial loss of the recording of Mrs. Sherrill's investigative interview. The Defendant argues that he was charged with criminal responsibility for Mrs. Sherrill's actions and that knowledge of her exact words regarding his alleged conduct was necessary in order to be prepared to defend against the charges. He argues, as well, that he lost the opportunity to impeach her with any inconsistencies between her pretrial statement and her trial testimony.

Evidence of the exact contents of Mrs. Sherrill's statement to investigators possessed potentially exculpatory value. *See id.* at 793. As such, the State had a duty to preserve it. *See Ferguson*, 2 S.W.2d at 917. In evaluating the degree of negligence involved, we note that the nonexistence of a recording of a portion of the interview occurred through inadvertence and was due to an equipment failure, rather than

negligence or willful misconduct in maintaining a copy of the recording and in providing it to the defendant. *See Merriman*, 410 S.W.3d at 793.

We consider, next, the significance of the unavailable evidence in light of the other, available evidence and the sufficiency of the other evidence to support the convictions. *See id.* We acknowledge that Mrs. Sherrill's account of what transpired relative to the offenses was a significant component of the State's proof. However, the victim was able to provide information which established the Defendant's presence during, promotion of, and encouragement of the offenses. The portion of Mrs. Sherrill's interview which was captured on the video is almost one hour long, and in the recorded portion, she provided detailed information about the Defendant's participation in the offenses. Investigator Goetz prepared a written report about the interview, and the defense received his report. The defense thoroughly cross-examined Mrs. Sherrill about her prior statement and the details of the offenses and was able to impeach her with prior inconsistencies.

Upon consideration of these factors, we conclude that the trial court did not err in its determination that the Defendant could have a fundamentally fair trial protected by adequate curative measures and that a dismissal was not warranted. We conclude, as well, that the court's jury instructions were an appropriate and adequate remedy for the absence of a recording of a portion of Mrs. Sherrill's interview. The Defendant is not entitled to relief on this basis.

### B. Defendant's Interview

The Defendant contends in a single sentence in his brief that the trial court erred in denying a motion to dismiss based upon the lack of disclosure of an alleged recording of the Defendant's investigative interview, but he has not explained why the court erred. Issues which are not supported by an argument are waived. Tenn. R. Ct. Crim. App. 10(b); *see* T.R.A.P. 27(a)(7).

### IV

### Prosecutorial Misconduct

The Defendant contends that the trial court erred in denying his motion to dismiss based upon alleged prosecutorial misconduct in failing to disclose the existence of Mrs. Sherrill's Lawrence County charges and a plea agreement. The State counters that no suppression, and therefore no prosecutorial misconduct, occurred. We agree with the State.

The Defendant's argument is premised upon his allegation that a *Brady* violation occurred relative to the Lawrence County prosecution of Mrs. Sherrill. He argues that Investigator Goetz's report, which defense counsel acknowledged he had received before the trial, did not specify that the sexual conduct between Mrs. Sherrill and the victim's brother took place in Lawrence County. The record reflects that the Defendant, Mrs. Sherrill, the victim, and the victim's brother lived together as a family in both Wayne County and Lawrence County. Investigator Goetz's report described the sexual conduct that formed the basis for the Lawrence County charges and identified the time frame within which the conduct occurred. As we stated in Section II.C., no *Brady* violation occurred relative to the specific non-disclosure of Mrs. Sherrill's Lawrence County charges and plea agreement. We again note that the purported evidentiary value of this evidence to the defense was to show that Mrs. Sherrill had the propensity to sexually assault her children without the Defendant's involvement, yet the facts underlying the Lawrence County charges showed that the Defendant promoted and assisted in the offenses against the victim's brother. The defense had received information about the substantive nature of the offense, and no evidence suggests that the Defendant was unaware of or had a disability preventing his recall of where he lived previously. The Defendant failed to show that prosecutorial misconduct occurred, and the trial court did not err in denying relief on this basis.

V

**Cumulative Error**

The Defendant contends that due process compels a new trial because of the existence of cumulative error. The concept of cumulative error is that multiple errors, though harmless individually, cumulatively violate a defendant's right to a fair trial. *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010). We have examined each of the Defendant's allegations of error and have concluded that none require relief. There are not multiple errors to accumulate in assessing whether due process compels a new trial. As such, this claim must fail.

VI

**Sentencing**

A.      **Motion to Reduce Sentence**

The State contends that the trial court erred in reducing the Defendant's rape sentences from ten to eight years. It argues that Tennessee Rule of Criminal Procedure 35 requires evidence of unforeseen post-sentencing developments to support modification of a sentence and that no such developments were shown. The Defendant counters that

post-sentence developments warranting a sentence reduction were established based upon Mrs. Sherrill's withdrawal of her original plea agreement and the terms of the modified plea agreement, which occurred after the Defendant's sentencing. We conclude that the court erred in granting the Defendant's Rule 35 motion to reduce the rape sentences.

At the sentencing hearing, the trial court imposed sentences of five years for each of the two incest convictions and ten years for each of the two rape convictions, and the court imposed all sentences concurrently. After the hearing, the Defendant filed a motion for reduction of his sentence pursuant to Tennessee Rule of Criminal Procedure 35. The Defendant alleged that (1) the State had not disclosed the 30% release eligibility term of Mrs. Sherrill's original Wayne County plea agreement and that she had been allowed after the Defendant's sentencing hearing to amend the agreement and enter a plea to different offenses which had a statutory 30% release eligibility and (2) the Defendant's sentences were excessive because the court inappropriately applied the enhancement factor for a defendant who was a leader in the commission of the offense and because the court considered as enhancement evidence facts related to the Defendant's "flight" after he was indicted.

At the hearing in which the trial court considered the motion for a new trial and the Rule 35 motion, Mr. Koger acknowledged that when Mrs. Sherrill's modified plea agreement was presented to the court, the judge expressed concern about equity in sentencing as between Mrs. Sherrill and the Defendant. The trial court then stated:

> [I]'m willing to put on the record my recollections of that as well, which is going to be largely consistent. In other words, the Court was concerned – I even think that in the effort to . . . schedule a hearing on Mr. Koger's motion, I believe there was a telephone conference call where I was in my office in Columbia and I told [the prosecutor and a member of the defense team] . . . [t]hat I was very much concerned about what modifying the Jennifer Sherrill sentence might do to the Court's thinking about the appropriateness of [the Defendant's] sentence. And this may be a good time to mention it, we will talk about more in detail later, but the Court's concern is not just human nature concern, but it's expressed in our sentencing law, under section 40-35-102, which says the foremost purpose of this chapter is to promote justice and in doing so adopts the following principles:
>
> > (1) A sentence justly deserved; and
> >
> > #2 principle: Is to assure fair and consistent treatment of all defendants by eliminating unjustified disparity in sentencing.

-29-

I didn't have [the statute] in front of me when I was talking to [the prosecutor and defense counsel], but I expressed concern even before Mr. Koger and [the prosecutor] met in Lawrenceburg about whether the Court could grant such a break to Jennifer Sherrill without having to at least consider such a break for [the Defendant].

After receiving the proof at the Defendant's motions hearing, the trial court stated, in pertinent part:

But what I want to give the State notice of before this final argument, if I can today, I'm going to shorten the sentence from ten years to eight years for [the Defendant]. And my logic for not doing more first of all is I don't know of any grounds for granting a new trial, or granting a Judgment of Acquittal. I think that the so called *Brady* material was adequately disclosed in a factual context if not in a charge and guilty plea context. To have permitted its use for cross examination if it did not unduly prejudice this current defendant which the Court thinks it would have. But I do think the Court can, on the Motion for New Trial, revisit the sentencing, besides I've got a specific motion for reducing the sentence. And on the one hand – let me go ahead and say this while it is on my mind, and this is a finding of fact, unless somebody convinces me to change my mind about this – ideally the court would and the Tennessee law would like to see [defendants] treated the same, if their conduct, culpability, mental capacity and other factors are equal. The law and the Court would want those punishments to be equal. But I think we've got grounds for several findings in this case.

One, they may in fact be equal because of 503(c) the parol[e] board could require Jennifer Sherrill to build 85 percent of her sentence, the same as they are going to require [the Defendant] to build 85 percent of his. So, they might be equal anyway.

But those defendants are not necessarily themselves equal. My understanding is that [the Defendant has] a regular high school diploma, not a Special Education high school diploma. But we know from the testimony at the trial from Mr. Harrison that Jennifer Sherrill early in her education was recognized to be Special and was in a Special Education program from early to middle elementary school through high school and received a Special Diploma. Her difficulty in testifying in Circuit Court and being [inconsistent] about a number of things, goes to the sufficiency of the

-30-

evidence against [the Defendant] on the one hand, but also reaffirmed her mental challenges on the other hand.

So, [the Defendant] may have more mental capacity than Jennifer and may have been more . . . "in control" . . . in the household than Jennifer, may have had the ability and the desire to control her conduct in these sexual events with the children. So, therefore from a culpability standpoint he may have more responsibility and therefore deserve more punishment.

And on another factor, Jennifer Sherrill was more cooperative, maybe to some extent because of her lack of mental capacity she may have spilled her guts more than a more intelligent defendant would have. While on the other hand, [the Defendant] was hiding out for a couple of months to avoid arrest and prosecution and never took responsibility for his actions. But to minimize any issues [defense counsel] raises today in his motions with regard to enhancing and mitigating factors. And to try to accomplish some equality in sentencing under the principles of 102, the Court believes it appropriate on this Motion for New Trial and on the Motion to Reduce Sentence to reduce the ten year sentences to eight years, but still leave them as in effect 100 percent offenses for which he can get no more than 15 percent credit because of finding that we don't have serious inequality.

After hearing the parties' arguments, the trial court stated the following after discussing with the parties the best way to effectuate its intent in the orders and judgments:

Okay, let's do that then, do very simple case status orders or whatever on both the defendant's motions, denying the Motion for New Trial and any alternative relief on that Motion, but granting the Rule 35 motion by reducing the Counts five and six sentences from 10 years to 8 years. The Court will leave the incest sentences at five years on Counts three and four.

Thereafter, orders denying the motion for a new trial and granting the Rule 35 motion were filed, and amended rape judgments reflecting eight-year sentences were entered.

Tennessee Rule of Criminal Procedure 35 permits a trial court to reduce a sentence upon motion filed within 120 days of the imposition of the sentence or revocation of probation. Tenn. R. Crim. P. 35(a).

The intent of this rule is to allow modification only in circumstances where an alteration of the sentence may be proper in the interests of justice.

-31-

> The modification permitted by this rule is any modification otherwise permitted by the law when the judge originally imposed sentence including but not limited to a transfer to the workhouse or probation to otherwise eligible defendants. If there is a modification, the state may appeal.

*Id.* (Advisory Comm'n Cmts.). Appellate review of a motion to reduce a sentence pursuant to Rule 35 is for abuse of discretion. *State v. Irick*, 861 S.W.2d 375, 376 (Tenn. Crim. App. 1993); *see State v. Ruiz*, 204 S.W.3d 772, 777-78 (Tenn. 2006) (noting *Irick*). An abuse of discretion is shown "only when the trial court has applied an incorrect legal standard, or has reached a decision which is illogical or unreasonable and causes an injustice to the party complaining." *Ruiz*, 204 S.W.3d at 778.

This court has held repeatedly that Rule 35 relief is appropriate if unforeseen post-sentencing information or developments compel reduction of the sentence in the interests of justice. *See, e.g.*, *State v. McDonald*, 893 S.W.2d 945, 947-48 (Tenn. Crim. App. 1994); *State v. Jonathan David Patterson*, No. M2016-01716-CCA-R3-CD, 2017 WL 4342212 (Tenn. Crim. App. Sept. 29, 2017), *perm. app. granted* (Tenn. Feb. 14, 2018). We acknowledge that our supreme court in *Jonathan David Patterson* has granted permission to appeal in a case in which the defendant advocates for a change of the law to permit a trial court to act within its discretion to modify a sentence that the court has decided is too severe, despite the absence of unforeseen post-sentencing developments or information. *See State v. Jonathan David Patterson*, No. M2016-01716-CCA-R11-SC (Tenn. Nov. 29, 2017) (Tennessee Rule of Appellate Procedure, Rule 11 application for permission to appeal); *id.* (Tenn. Feb. 14, 2018) (order granting permission to appeal). At the present time, however, existing authority provides that, pursuant to Rule 35, modification of a sentence in "the interests of justice" requires a showing of unforeseen post-sentencing information or developments.

Turning to the present case, the State argues that Mrs. Sherrill's amended plea agreement with 30% release eligibility was not an unforeseen post-sentencing development. The State argues that it is commonplace and therefore foreseeable that a codefendant who pleads guilty and testifies against a defendant may receive a more favorable sentence than a defendant who is convicted at a trial. We agree. The evidence shows that, at the time of the Defendant's sentencing, Mrs. Sherrill had pleaded guilty without an agreement as to her sentence and had not yet been sentenced. Thus, the Defendant did not know what sentence Mrs. Sherrill would receive. Although the Defendant did not know, specifically, that the parties to Mrs. Sherrill's plea agreement had been under a mistaken impression that Mrs. Sherrill would receive 30% release eligibility, he knew that she had pleaded guilty and had cooperated with the State by testifying against him. Based upon this information, he should have known that she was likely to receive a more favorable sentence than he would. We note, as well, that even though the Defendant had no specific knowledge at the time of his sentencing that Mrs.

Sherrill would later move to withdraw her plea, the withdrawal of her plea was in accord with the Rules of Criminal Procedure. *See* Tenn. R. Crim. P. 32(f)(1) (permitting withdrawal of a guilty plea "for any fair and just reason").

In addition, the trial court's comments relative to the motion to reduce the Defendant's sentence show that it was influenced by the desire to "minimize any issues [defense counsel] raises today in his motions with regard to enhancing and mitigating factors" as well as to "try to accomplish some equality in sentencing under the principles of [Code section 40-35-]102." To the extent that the court considered the propriety of its previous application of enhancement factors, it examined matters that existed at the time of its sentencing determination and thus were not unforeseen post-sentencing information or developments. *See State v.Randall Evans*, No. E2015-01815-CCA-R3-CD, 2016 WL 4582499, at *4 (Tenn. Crim. App. Sept. 2, 2016) (holding that the trial court erred in considering, for purposes of a Rule 35 motion, evidence that had been presented "prior to the entry of the judgment of conviction"). A Defendant's redress for the alleged erroneous application of enhancement factors is through an appeal as of right. *See* T.C.A. § 40-35-401(b), (d) (2014); *Ruiz*, 204 S.W.3d at 777 (noting that an appeal of a sentence is distinct from an appeal from a Rule 35 motion to reduce a sentence). In addition, the court made detailed observations about the relative mental capabilities of the Defendant and Mrs. Sherrill and about their comparative culpability in the offenses. The court's factual observations concern evidence which was before it at the time of sentencing and, as such, did not constitute unforeseen post-sentencing information or developments. *See Randall Evans*, 2016 WL 4582499, at *4.

Because the trial court reduced the Defendant's sentence based upon facts and circumstances which existed at the time of sentencing, as well as upon matters which did not constitute unforeseeable post-sentencing information and developments, its reduction of the Defendant's sentence constituted an abuse of discretion. As such, we must reverse the court's sentence reduction for the rape convictions, reinstate the ten-year sentences, and remand for entry of amended judgments.

### B.       Propriety of the Original Sentencing Determination

In reaching the conclusion that the trial court erred in reducing the Defendant's rape sentences pursuant to Rule 35, we have not overlooked the Defendant's argument at the hearing on the motions for a new trial and Rule 35 reduction of sentences that the trial court had misapplied enhancement factors when it originally imposed the sentences. The previous application of enhancement factors does not constitute unforeseen post-sentencing information or developments contemplated by Rule 35. *See* Tenn. R. Crim. P. 35; *cf. Jonathan David Patterson*, 2017 WL 4342212, at *1 (Witt, J., concurring) ("Sound policy reasons dictate that a defendant not be availed the power to effectively challenge the *original* sentence by filing a Rule 35 motion *after the trial court's*

-33-

*jurisdiction has ended*.") (emphasis in original). The Defendant's motion for a new trial, however, raised issues regarding the application of enhancement factors and, although this was not a basis upon which the court could have granted a new trial, it raised an issue of alleged trial court error, and it did so before the judgment had become final. The Defendant has not raised an issue regarding the original sentencing on appeal, although he came to this court having been granted relief in the form of a reduction to the minimum sentence for rape. *See* T.C.A. § 40-35-111(b)(2) (2014) (stating that a person conviction of a Class B felony shall receive a sentence which is between eight and thirty years). Also, the record reflects that the trial court considered both the question of the propriety of its previous application of enhancement factors and the motion for a sentence reduction at the combined hearing on the motion for a new trial and the Rule 35 motion. Separate from our review of the court's action pursuant to Rule 35, we will consider whether the trial court erred in its original sentencing determination.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103 (2014), -210 (2014); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2014).

Likewise, a trial court's application of enhancement and mitigating factors are reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id.*

As we have stated, the Defendant challenged the application of the enhancement factor related to his leadership in the offenses and to his "flight" after his indictment. Tennessee Code Annotated section 40-35-114(2) (2014) (amended 2015, 2016, 2017) permits enhancement if "[t]he defendant was a leader in the commission of an offense involving two (2) or more criminal actors." The court found at the sentencing hearing

-34-

that the Defendant was a leader in the offenses. The record reflects that the Defendant at least encouraged, if not coerced, Mrs. Sherrill into committing the offenses and that Mrs. Sherrill had some level of limited intellectual functioning. The evidence showed that the offenses were the Defendant's idea because he wanted the victim to experience sexual intercourse. The court did not err in enhancing the Defendant's sentences on the basis of his leadership in the commission of the offenses.

We likewise reject the Defendant's argument at the motion for a new trial hearing that the trial court inappropriately enhanced the sentences based upon the Defendant's flight. The record reflects that the Defendant asked the court for mitigating weight based upon his assistance to the authorities in uncovering an offense carried out by another. *See id.* § 40-35-113(9) (2014). The court rejected this mitigating factor, noting that the Defendant "hid out in Wayne County with his family or others for a significant period of time between the charges and when he was arrested." The record does not reflect, however, that the court applied any enhancement weight to the Defendant's eluding the authorities after his indictment.

The record does not support a conclusion that the trial court erred in its application of the factor for leadership in the commission of the offenses, and the record does not support that the court accorded enhancement weight based upon the Defendant's eluding the authorities after his indictment. We conclude that the court did not abuse its discretion in its original sentencing determination.

In consideration of the foregoing and the record as a whole, the incest judgments are affirmed. The rape convictions are affirmed, but the sentences are reversed, and the case is remanded for entry of amended judgments reflecting ten-year sentences.

_____
ROBERT H. MONTGOMERY, JR., JUDGE

-35-